**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS**

| | |
|---|---|
| Peter Hoffman, individually and on behalf of all others similarly situated, | 7:22-cv-00397-KMK |
| Plaintiff, | |
| - against - | First Amended Class Action Complaint |
| Kraft Heinz Foods Company, | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.  Kraft Heinz Foods Company ("Defendant") manufactures, labels, markets, and sells mango and peach flavored concentrated liquid under the MiO brand purporting to get its mango and peach taste from natural flavorings ("Product").



## I.   CONSUMER DEMAND FOR NATURAL FLAVORS

2.     Consumers are increasingly concerned about the ingredients added to what they eat and drink.

3.     Surveys have shown that consumers are less likely to buy beverages, even sodas, which have artificial ingredients.

4.     Within the spectrum of artificial ingredients, consumers are especially focused on, and seek to avoid, artificial flavors, and seek product with only natural flavors.

5.     The representation that the Product has "100% Natural Flavors" appeals to the more than seven out of ten consumers who avoid artificial flavors, as these synthetic ingredients are believed to be associated with detrimental health and environmental effects.[1]

6.     Natural flavor is defined as "essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents" from fruits or vegetables, "whose significant function in food is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

7.     Artificial flavor is defined as "any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 C.F.R § 101.22(a)(1).

8.     According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[2]

9.     According to Paul Manning, chief executive officer and president of Sensient

---

[1] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Product Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[2] Lauren Manning, How Big Food Is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.

Technologies, "Consumer desire for naturally flavored products is an emerging trend."[3]

10.     Explanations for why consumers prefer foods containing natural, instead of artificial flavors, are varied.

11.     A recent survey reported that over 82% of US respondents believe that foods with artificial flavors are less healthy than those promoted as containing natural flavors and/or not containing artificial flavors.

12.     Consumers seek to avoid artificial flavors because they are weary of ingredients which are highly processed with chemical additives and synthetic solvents in laboratories.

13.     According to Nielsen, the absence of artificial flavors is very important for over 40% of respondents to their Global Health & Wellness Survey.

14.     One scholar theorized "the preference for natural product appeals to a moral ideology and offers a moral satisfaction."[4]

15.     The trade journal, Perfumer & Flavorist, described "The Future of Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[5]

16.     Mintel announced that consumer avoidance of artificial flavors is just as strong as their desire for natural flavors, in its Report, "Artificial: Public Enemy No. 1."[6]

17.     About half of Americans say they seek out natural flavors at least some of the time.

18.     In contrast, artificial flavors were sought out by only about one in 10 consumers, with approximately half saying they avoid each of them at least some of the time.

---

[3] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018.
[4] Rozin, P., Spranca, M., Krieger, Z., Neuhaus, R., Surillo, D., Swerdlin, A., & Wood, K. (2004). Preference for natural: Instrumental and ideational/moral motivations, and the contrast between foods and medicines. Appetite, 43(2), 147–154. doi:10.1016/j.appet.2004.03.005.
[5] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.
[6] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Product Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.

19.     Nielsen reported that 62% of consumers try to avoid artificial flavors.

20.     New Hope Network concluded that 71% of consumers avoid artificial flavors.

21.     Label Insight determined that 76% of consumers avoid artificial flavors.

22.     A recent survey shows more than three in four people worldwide are convinced that artificial flavors have no place on their ingredient lists.[7]

23.     According to Forbes, 88% of consumers consider foods without artificial flavors to be more natural and healthier than foods with artificial flavors and would pay more for such foods.

## II.   PRODUCT REPRESENTED AS ONLY CONTAINING NATURAL FLAVORS

24.     Beneath the description of the Product as "MANGO PEACH" atop a peach-colored background, the label states "NATURAL FLAVOR WITH OTHER NATURAL FLAVOR."



25.     The representation that the Product's flavor is from "Natural Flavor With Other Natural Flavor" appeals to the more than seven out of ten consumers who avoid artificial flavors.

26.     By identifying the Product as getting its mango and peach taste from natural flavoring, consumers expect only natural flavoring ingredients will contribute to its taste.

27.     Though the ingredients include "Natural Flavor," they also include "Malic Acid."

---

[7] What 'Natural' Really Means to Consumers GNT Group's Guide to Global Consumer Demands attests importance of natural colors for future-proof product, July 13, 2017.



**INGREDIENTS:** WATER, <mark>MALIC ACID</mark>, CITRIC ACID, CONTAINS LESS THAN 2% OF <mark>NATURAL FLAVOR</mark>, SUCRALOSE AND ACESULFAME POTASSIUM (SWEETENERS), POTASSIUM CITRATE, GUM ARABIC, SUCROSE ACETATE ISOBUTYRATE, YELLOW 5, YELLOW 6, RED 40, POTASSIUM SORBATE (PRESERVATIVE).

28.   The Product contains more malic acid than natural flavor, listed as the second most predominant ingredient by weight.

29.   Unbeknownst to consumers, the ingredient list does not disclose that this malic acid is an artificial flavoring ingredient which provides the Product's mango and peach taste.

30.   Federal and identical state regulations require ingredients to be designated by their specific name instead of their generic name. 21 C.F.R. § 101.4(b).

31.   Defendant only lists "Malic Acid," the generic name for this ingredient, even though its specific name is "DL-Malic Acid."

## III.   COMPONENTS OF TASTE

32.   A flavor is a substance the function of which is to impart taste. *See* 21 C.F.R. § 101.22(a)(1), (3).

33.   Taste is the combination of sensations arising from specialized receptor cells located

5

in the mouth.[8]

34.    Taste can be defined as sensations of sweet, sour, salty, bitter, and umami.

35.    However, limiting taste to five categories suggests that taste is simple, which is not true.

36.    For example, the taste of sour includes the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples (malic acid), and wines (tartaric acid).

37.    Each of those acids is responsible for unique sensory characteristics of sourness.

38.    Fruit flavors are the sum of the interaction between sugars, acids, and volatile compounds.[9]

39.    Consumer acceptability of the flavors of mango and peach are based on their perceived sweetness and tartness, determined by their sugar to acid ratio.

40.    Sugars, mainly glucose and fructose, and their ratio to acids, such as citric and malic acid, determine the sweetness of fruits.

41.    The table below shows the acid composition of numerous fruits.

| Fruit | Predominant Acid | Secondary Acids |
|---|---|---|
| Apple | Malic Acid (95%) | Tartaric Acid, Fumaric Acid |
| Apricot | Malic Acid (70%) | Citric Acid, Tartaric Acid |
| Blackberry | Citric Acid | Malic Acid |
| Blueberry | Citric Acid | Malic Acid, Quinic Acid |
| Cherry | Malic Acid (94%) | Tartaric Acid |
| Cherry (Tropical) | Malic Acid (32%) | Citric Acid |
| Grape | Malic Acid (60%) | Tartaric Acid |
| Grapefruit | Citric Acid | Malic Acid |
| Guava | Citric Acid | Malic Acid |

---

[8] Gary Reineccius, Flavor Chemistry and Technology § 1.2 (2d ed. 2005).
[9] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

| | | |
|---|---|---|
| Lime, Lemon | Citric Acid | Malic Acid |
| Mango | Citric Acid | Malic Acid, Tartaric Acid |
| Orange | Citric Acid | Malic Acid |
| Peach | Malic Acid (73%) | Citric Acid |
| Pear | Malic Acid (77%) | Citric Acid |
| Pineapple | Citric Acid | Malic Acid |
| Pomegranate | Malic Acid (>50%) | Citric Acid (>22%) |
| Raspberry | Citric Acid | Malic Acid, Tartaric Acid |
| Strawberry | Citric Acid | Malic Acid, Tartaric Acid |
| Tamarind | Tartaric Acid | Citric Acid, Malic Acid |
| Watermelon | Malic Acid (99%) | Fumaric Acid |

42.    In mango, malic acid is the second most significant fruit acid.

43.    In peaches, malic acid is the most significant fruit acid.

44.    Malic acid provides the fruity, sweet, and sour taste of these fruits.

## IV.   CHEMICAL STRUCTURE OF MALIC ACID

45.    Malic acid (molecular formula $C4H6O5$) is the common name for 1-hydroxy-1, 2-ethanedicarboxylic acid.

46.    Malic acid has two isomers, or different arrangements of atoms in the molecule, L-malic acid, and D-malic acid. 21 C.F.R. § 184.1069.

47.    An isomer is a molecule sharing the same atomic make-up as another but differing in structural arrangements.

48.    Stereoisomers contain different types of isomers, each with distinct characteristics that separate each other as different chemical entities with different chemical properties.

49.    Stereoisomers differ from each other by spatial arrangement, meaning different atomic particles and molecules are situated differently in any three-dimensional direction by even

one degree.

50.    An enantiomer is a type of stereoisomer that is a mirror-image and cannot be superimposed.

51.    Enantiomers are like right and left-hand versions of the same molecular formula.

52.    D-Malic Acid and L-Malic Acid are enantiomers.

53.    Below are skeletal formulas of the enantiomers D-Malic Acid and L-Malic Acid.



54.    L-malic acid occurs naturally in various fruits and is known for providing sweetness and tartness, among other flavors.

55.    D-Malic Acid does not occur naturally.

56.    D-Malic Acid is most commonly found as a racemic mixture of the D isomer and L isomer, DL-Malic Acid, which is commercially made from petroleum product.

## V.    ADDITION OF DL-MALIC ACID

57.    Adding DL-Malic Acid to a solution of natural flavorings containing L-Malic Acid changes the concentration of malic acid in the solution and the ratio of total malic acid to sugars in that solution.

58.    Natural sugars – like glucose, fructose, and sucrose – combined with artificial DL-

8

Malic Acid in a ratio engineered to resemble the natural chemical combination of sugar and L-Malic Acid found in the characterizing mango and peach flavors of the Product is not equivalent to the natural flavors of mango and peach.

59.    A natural chemical combination of sugar and L-Malic Acid, altered by adding artificial DL-Malic Acid, is no longer equivalent to the original chemical combination of sugar and L-Malic Acid, and therefore no longer the natural flavors of mango and peach.

60.    Defendant includes DL-Malic Acid to make the Product taste tart and fruity, like mango and peach taste naturally.

61.    Defendant adds artificial DL-malic acid to the Product to provide, enhance, simulate, and/or reinforce the sweet, fruity, and tart taste that consumers associate with mango and peach.

62.    Defendant had the option to add naturally extracted L-Malic Acid, a naturally manufactured acid such as citric acid, or natural mango and peach flavors, but used artificial DL-Malic Acid because it was likely cheaper or more accurately resembled the flavors of mango and peach than citric acid or other acids.

63.    DL-Malic Acid is synthetically produced from petroleum in a high-pressure, high-temperature, catalytic process.

64.    Since there are natural and artificial types of malic acid, laboratory analysis is required to identify which type was used in the Product.

65.    Laboratory analysis concluded the Product contains artificial, DL-Malic Acid, instead of natural, L-Malic Acid.

## VI.   REQUIREMENTS FOR LABELING

66.    Federal and identical state regulations prohibit false and deceptive identification of the source of a food or beverage's characterizing flavors.

67.     The Product's primary or "characterizing" flavors are mango and peach. 21 C.F.R. §
101.22(i).

68.     Federal and identical state regulations require the Product to disclose whether its
characterizing flavors are from mango and peach, natural sources other than these fruits, and/or
from artificial, chemical sources, such as DL-Malic Acid, from petroleum. 21 C.F.R. § 101.22(i).

69.     The lower portion of the Product label states, "MANGO PEACH" directly above
"NATURAL FLAVOR WITH OTHER NATURAL FLAVOR."



70.     This language is required by federal and state regulations where a food or beverage
may contain some flavor from its characterizing ingredients, i.e., mango and peach, and other
flavor from natural sources other than the characterizing ingredients. 21 C.F.R. § 101.22(i)(1)(iii).

71.     Since the Product contains artificial flavor, DL-Malic Acid, that simulates and
resembles the characterizing mango and peach flavors, the name of the characterizing flavor is
required to "be accompanied by the word(s) 'artificial' or 'artificially flavored,'" such as "Natural
and Artificial Mango Peach Flavor" or "Naturally and Artificially Flavored Mango Peach." 21
C.F.R. § 101.22(i)(2).

72.     The statement, "Natural Flavor With Other Natural Flavor," is misleading based on
the presence of the artificial flavor ingredient DL-Malic Acid.

73.     Defendant's omission of any reference to artificial flavor on the front label and
ingredient list was misleading and caused consumers like Plaintiff to expect only natural flavors.

74.    DL-Malic Acid is not a "natural flavor" as this term is defined by federal and state regulations and is not derived from a fruit or vegetable or any other natural source.

75.    A combination of sugar and DL-Malic Acid in a ratio resembling mango and peach cannot be derived from a fruit or vegetable.

76.    A combination of sugar, natural L-Malic Acid, and artificial DL-Malic Acid combined in a way to resemble the natural ratio of sugar and L-Malic Acid found in the mango and peach flavors of the Product cannot be derived from a fruit or vegetable.

77.    A combination of sugars and artificial DL-Malic Acid engineered to resemble the natural ratio of sugars and natural L-Malic Acid that make up the natural flavors of mango and peach is not a natural flavor.

78.    The natural flavors of mango and peach are heavily dependent on a specific ratio of sugar and L-Malic Acid, while the Product's flavor depends upon a ratio of sugar and DL-Malic Acid.

79.    DL-Malic Acid could function as a flavor enhancer or PH balancer, depending on its application.

80.    A flavor enhancer is "added to supplement, enhance, or modify the original taste and or aroma of a food without imparting a characteristic taste or aroma of its own." 21 C.F.R. § 170.3(o)(11).

81.    For example, malic acid added to vinegar (ascetic acid) dishes like barbecue pork, coleslaw, or pickled eggs would not fundamentally alter the underlying vinegar flavor.

82.    However, because the flavor imparted by malic acid is a core component of mangos and peaches, DL-Malic Acid does not function as a flavor enhancer.

83.    Under these circumstances, artificial DL-Malic Acid fundamentally alters the

11

original combination of sugar and natural L-Malic Acid core to the flavors of mango and peach,

so that the Product's flavor is no longer a natural ratio of sugar and L-Malic Acid but instead an

artificial ratio of sugar and DL-Malic Acid.

84.     PH balancers are "substances added to change or maintain active acidity or basicity,

including buffers, acids, alkalis, and neutralizing agents." 21 C.F.R. § 170.3(o)(23).

85.     The Product does not use DL-Malic Acid as a PH balancer because there is no need

to change or maintain its active acidity or basicity.

86.     Irrespective of the purpose for which DL-Malic Acid was added, its effect on the

Product's mango and peach taste is the same.

87.     Plaintiff and consumers are unable to learn the malic acid listed in the ingredients is

the artificial version without a chemistry kit and detailed knowledge of the relevant regulations.

88.     Plaintiff purchased the Product because "Natural Flavor With Other Natural Flavor"

told him that only natural flavors were responsible for the mango and peach taste.

## VII.  CONCLUSION

89.     Defendant makes other representations and omissions with respect to the Product

which are false and/or misleading.

90.     Reasonable consumers must and do rely on a company to honestly identify and

describe the components, attributes, and features of a product, relative to itself and other

comparable products or alternatives.

91.     The value of the Product that Plaintiff purchased was materially less than the value

as represented by Defendant.

92.     Defendant sold more of the Product and at higher prices than it would have in the

absence of this misconduct, resulting in additional profits at the expense of consumers.

93.    Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

94.    As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $3.99 per 1.62 OZ or 24 servings, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

95.    Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

96.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

97.    Plaintiff Peter Hoffman is a citizen of New York.

98.    Defendant Kraft Heinz Foods Company is a Pennsylvania limited liability company with a principal place of business in Pittsburgh, Allegheny County, Pennsylvania and at least one member of Defendant is not a citizen of the same state as the Plaintiff.

99.    The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

100.   Defendant transacts business within this District through sale of the Product to residents of this District, by third-parties such as grocery stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

101.   Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims occurred within this District, Plaintiff's exposure to the representations

and awareness of the issues described here.

102.  This action is properly assigned to the White Plains Courthouse in this District because a substantial part of the events or omissions giving rise to these claims occurred in Westchester County, i.e., Plaintiff's purchase, consumption and use of the Product and his awareness and/or experiences of and with the issues described here.

<u>Parties</u>

103.  Plaintiff Peter Hoffman is a citizen of New Rochelle, Westchester County, New York.

104.  Defendant Kraft Heinz Foods Company is a Pennsylvania limited liability company with a principal place of business in Pittsburgh, Pennsylvania, Allegheny County.

105.  Defendant's predecessor, the Kraft Corporation, was started in 1903 through the sale of cheese door-to-door in Chicago.

106.  Within twenty years, Kraft had become the largest cheese manufacturer in the world.

107.  Over the next century, Kraft would become one of the largest food and beverage companies in the world, and own some of the most iconic brands, like Oscar Mayer and Jell-O.

108.  Kraft was one of the first companies to directly advertise to consumers, not only through color print ads but on tv and radio.

109.  Kraft was the second-largest sponsor of TV and radio programs, which created goodwill and trust in consumers.

110.  MiO was developed as a convenient alternative to messy beverage powders in adding flavor to water.

111.  Defendant developed and heavily marketed MiO to capitalize on the tens of billions of dollars consumers spend annually on water.

14

112.   Defendant knew that consumers like Plaintiff were avoiding sugary beverages and artificial flavoring ingredients and consuming more water.

113.   Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including ShopRite, 13 City Pl, White Plains, NY 10601 between October 2021 and November 2021, and/or among other times.

114.   Plaintiff believed the Product's peach and mango taste was only from natural flavoring ingredients and not from artificial flavoring ingredients because that is what the representations said and implied.

115.   Plaintiff relied on the words, coloring, descriptions, layout, and packaging on the Product, on the labeling, statements, omissions, and/or claims made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

116.   Plaintiff was disappointed because he believed the Product contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

117.   Plaintiff bought the Product at or exceeding the above-referenced price.

118.   Plaintiff would not have purchased the Product if he knew the representations and omissions were false and misleading or would have paid less for it.

119.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components regarding their flavoring.

120.   The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

15

<u>Class Allegations</u>

121.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Virginia and Oklahoma who purchased the Product during the statutes of limitations for each cause of action alleged.

122.   Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

123.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

124.   Plaintiff is an adequate representative because his interests do not conflict with other members.

125.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

126.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

127.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

<u>(Consumer Protection Statute)</u>

128.   Plaintiff incorporates by reference all preceding paragraphs.

129.   Plaintiff and class members desired to purchase a product that got its characterizing

or main taste from natural flavoring ingredients and not artificial flavoring ingredients.

130.   Defendant's false and deceptive representations and omissions are material in that they influenced consumer purchasing decisions, including Plaintiff's.

131.   Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

132.   Plaintiff relied on the representations that the Product's mango and peach taste was due to natural flavoring ingredients and not artificial flavoring ingredients.

133.    Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

134.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

135.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

136.   Defendant intended that each of the members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

137.   As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

138.   Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breach of Express Warranty</u>

139.   The Product was manufactured, identified, and sold by Defendant and expressly warranted to Plaintiff and class members that its characterizing or main taste was from natural flavoring ingredients and not artificial flavoring ingredients.

140.   Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

141.   Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

142.   Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product's characterizing or main taste was from natural flavoring ingredients and not artificial flavoring ingredients.

143.   Defendant's representations affirmed and promised that the Product's characterizing or main taste was from natural flavoring ingredients and not artificial flavoring ingredients.

144.   Defendant described the Product as getting its characterizing or main taste from natural flavoring ingredients and not artificial flavoring ingredients, which became part of the basis of the bargain that the Product would conform to its affirmations and promises.

145.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

146.   This duty is based on Defendant's outsized role in the market for water enhancers, as the custodian of the category leading Mio brand.

18

147.  Plaintiff recently became aware of Defendant's breach of the Product's express warranty.

148.  Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

149.  Plaintiff hereby provides notice to Defendant that it breached the express warranty associated with the Product.

150.  Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

151.  The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

152.  The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if its characterizing or main flavors were from natural flavoring ingredients and not artificial flavoring ingredients.

153.  The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected its characterizing or main flavors were from natural flavoring ingredients and not artificial flavoring ingredients, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

154.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

19

<u>Fraud</u>

155.   Defendant misrepresented and/or omitted the attributes and qualities of the Product, that its characterizing or main flavors were from natural flavoring ingredients and not artificial flavoring ingredients.

156.   The records Defendant is required to maintain provided it with actual and constructive knowledge of the falsity or deception.

157.   Defendant knew of the issues described here yet did not address them.

158.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.   Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.   Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

3.   Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4.   Other and further relief as the Court deems just and proper.

Dated:   June 21, 2022

                                                                       Respectfully submitted,

                                                                       /s/Spencer Sheehan
                                                                       Sheehan & Associates, P.C.
                                                                       Spencer Sheehan
                                                                       60 Cuttermill Rd Ste 412
                                                                       Great Neck NY 11021

Tel: (516) 268-7080
spencer@spencersheehan.com

Shub Law Firm LLC
Jonathan Shub
Kevin Laukaitis*
134 Kings Hwy E Fl 2
Haddonfield NJ 08033
Tel: (856) 772-7200
jshub@shublawyers.com
klaukaitis@shublawyers.com

*Pro Hac Vice Application Forthcoming
or Submitted