UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETER HOFFMAN, *individually and on behalf of all others similarly situated*,

                      Plaintiff,

      v.

KRAFT HEINZ FOODS COMPANY,

                      Defendant.

---

No. 22-CV-397 (KMK)

<u>OPINION & ORDER</u>

Angele Aaron, Esq.
Katherine Lalor, Esq.
Spencer Sheehan, Esq.
Sheehan & Associates, P.C.
Great Neck, NY
*Counsel for Plaintiff*

Jonathan Shub, Esq.
Shub Law Firm LLC
Haddonfield, NJ
*Counsel for Plaintiff*

Dean N. Panos, Esq.
Alexander Smith, Esq.
Jenner & Block LLP
Chicago, IL and Los Angeles, CA
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Peter Hoffman ("Plaintiff") brings this putative class action against Kraft Heinz Foods Company ("Defendant"), alleging that the labeling on Defendant's Mango Peach MiO, a flavored liquid beverage concentrate (the "Product") is deceptive and misleading. (*See generally* First Am. Compl. ("FAC") (Dkt. No. 15).) Plaintiff brings claims for damages against Defendant for (1) violation of §§ 349 and 350 of the New York General Business Law ("GBL"),

N.Y. G.B.L. §§ 349, 350; (2) violations of consumer protection laws of Virginia and Oklahoma; (3) common law breach of express warranty; and (4) common law fraud.  (*See id.* ¶¶ 128–158.) Before the Court is Defendant's Motion To Dismiss the FAC (the "Motion").  (*See* Not. of Mot. (Dkt. No. 21).)  For the foregoing reasons, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from the FAC and are assumed to be true for the purposes of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

Defendant is a multinational food company with its principal place of business in Pittsburgh, Pennsylvania.  (*See* FAC ¶ 104.)  Included in Defendant's product lines is MiO, a "flavored concentrated liquid" that serves as a liquid water enhancer "developed as a convenient alternative to messy beverage powders in adding flavor to water."  (*See id.* ¶¶ 1, 110.)  As relevant to the instant Action, Defendant specifically manufactures a "mango and peach" flavored variety of MiO which Defendant represents on the label as containing "natural flavor with other natural flavor."  (*Id.* ¶ 1.)

 

(*See id.* ¶ 1.)

Plaintiff alleges that the Product's advertisements are false, deceptive, and misleading because of the presence of artificial flavors, namely DL-Malic Acid. (*Id.* ¶ 72.) The Product's ingredients list "Malic Acid" as the "second most predominant ingredient by weight." (*Id.* ¶¶ 27–28.) Plaintiff alleges that Defendant's representation that the Product's flavor is from natural flavors is misleading, because "[b]y identifying the Product as getting its mango and peach taste from natural flavoring, consumers expect only natural flavoring ingredients to contribute to the taste." (*Id.* ¶¶ 25–26.) Plaintiff alleges that because "the ingredient list does not disclose that this malic acid is an artificial flavoring ingredient which provides the Product's mango and peach taste[,]" Plaintiff was misled by the Product's contents. (*Id.* ¶ 29.) Plaintiff alleges that, unlike "L-Malic acid" which "occurs naturally in various fruits and is known for providing sweetness and tartness, among other flavors," D-Malic acid "does not occur naturally." (*Id.* ¶¶ 54–56.) Plaintiff specifically alleges that "[l]aboratory analysis concluded the Product contains artificial, DL-Malic Acid instead of natural, L-Malic Acid." (*Id.* ¶ 65.)

Plaintiff alleges several reasons as to why Defendant includes DL-Malic Acid in the Product. For example, Plaintiff alleges that it is included: (1) "to make the Product taste tart and fruity, like mango and peach taste naturally," (*id.* ¶ 60); (2) "to provide, enhance, simulate, and/or reinforce the sweet, fruity, and tart taste that consumers associate with mango and peach," (*id.* ¶ 61); and (3) that it "could function as a flavor enhancer or PH balancer," (*id.* ¶ 79). Plaintiff concludes, however, that "because the flavor imparted by malic acid is a core component of mangos and peaches," malic acid "does not function as a flavor enhancer" but instead "fundamentally alters the original combination of sugar and natural L-Malic Acid core to the flavors of mango and peach, so that the flavors of the Product are no longer [] natural[.]" (*Id.* ¶¶ 82–83.) In addition, Plaintiff alleges that the malic acid "is not a PH balancer because there is no need to change or maintain active acidity or basicity." (*Id.* ¶ 85.)

Finally, Plaintiff alleges that federal and state regulations "prohibit false and deceptive identification of the source of a food or beverage's characterizing flavors." (*Id.* ¶ 66.) Here, Plaintiff alleges that the Product's "primary or characterizing flavors are mango and peach." (*Id.* ¶ 67 (quotation marks omitted).) The Product lists "Mango Peach" directly above "natural flavor with other natural flavor" which Plaintiff alleges is false and misleading, as it is "required to be accompanied by the word(s) 'artificial' or 'artificially flavored[.]'" (*Id.* ¶¶ 68–73 (quotation marks omitted).)

Between October 2021 and November 2021, Plaintiff purchased the product "on one or more occasions" at various stores, including at ShopRite, 13 City Pl, White Plains, NY 10601, for a "premium price" of "no less than $3.99 per 1.6 OZ or 24 servings, excluding tax and sales[.]" (*Id.* ¶¶ 94, 113.) Plaintiff alleges that he "purchased the Product because 'Natural Flavor With Other Natural Flavor' told him that only natural flavors were responsible for the

mango and peach taste." (*Id*. ¶ 88.)  In purchasing the Product, Plaintiff alleges he "believed the Product's peach and mango taste was only from natural flavoring ingredients and not from artificial flavoring ingredients because that is what the representations said and implied." (*Id*. ¶ 114.)  Plaintiff accordingly "relied on the words, coloring, descriptions, layout, and packaging on the Product, on the labeling," and on statements made in Defendant's digital, print, and social media marketing. (*Id*. ¶¶ 115.)  Without this, Plaintiff alleges that he "would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it." (*Id*. ¶ 118.)

B.  Procedural History

Plaintiff filed his initial Complaint on January 15, 2022.  (*See* Compl. (Dkt. No. 1).)  On May 31, 2022, Defendant filed a pre-motion letter in anticipation of filing a motion to dismiss the original Complaint, (*see* Dkt. No. 9), but on June 21, 2022, Plaintiff filed the FAC, (*see* FAC).  On July 5, 2022, Defendant filed another pre-motion letter in anticipation of filing a motion to dismiss the FAC.  (*See* Dkt. No. 16.)  Following Plaintiff's response to Defendant's pre-motion letter, (*see* Dkt. No. 17), the Court held a pre-motion conference on July 19, 2022, (*see* Dkt. (minute entry for July 19, 2022)).  Pursuant to the briefing schedule adopted at the conference, Defendant filed the instant Motion on August 9, 2022.  (*See* Not. of Mot.; Def.'s Mem. of Law in Supp. of Mot. To Dismiss ("Def.'s Mem.") (Dkt. No. 22); Not. of Request for Judicial Not. in Supp. of Mot. (Dkt. No. 23).)[1]  Plaintiff filed his Opposition on September 8,

---

[1] Defendant filed a Request for Judicial Notice along with its memorandum in support of Defendant's motion to dismiss, requesting that the Court take judicial notice of a "document published by the U.S. Department of Agriculture's Technical Advisory Panel" available on the USDA's website. (*See* Dkt. No. 23.)  Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56."  *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp.

2022, (*see* Pl.'s Mem. of Law in Opp'n to Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 25)), and

Defendant filed its Reply on September 22, 2022, (*see* Def.'s Reply Mem. of Law in Supp. of

Mot. To Dismiss ("Def.'s Reply Mem.") (Dkt. No. 26)).  Defendant also filed two notices of

supplemental authority on October 17, 2022 and January 3, 2023.  (Dkt. Nos. 27, 28.)

## II.  Discussion

### A.  Standard of Review

Defendant moves to dismiss the FAC pursuant to Federal Rule of Civil Procedure

12(b)(6).  (*See* Not. of Mot.)  The Supreme Court has held that although a complaint "does not

need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's

obligation to provide the grounds of his entitlement to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed,

Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-

---

2d 273, 275 (S.D.N.Y. 2002) (citation omitted).  However, "the [c]ourt's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.* (citations omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety. . ., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)).

While Defendant does not meet its burden to show that this document is integral to this motion to dismiss, the Court will take judicial notice of the Exhibit.  Under the Federal Rules of Evidence, a court may take judicial notice of a fact outside of the pleadings provided that the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  "When considering a motion made pursuant to Rule 12(b)(6), the Court may take judicial notice of 'documents retrieved from official government websites' . . . ." *Jones v. Cuomo*, 542 F. Supp. 3d 207, 211 n.1 (S.D.N.Y. 2021) (quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015)); *see also, e.g., J.T. v. de Blasio*, 500 F. Supp. 3d 137, 149 (S.D.N.Y. 2020) (taking judicial notice of documents "that were published on an official government website"); *Williams v. PMA Cos.*, 419 F. Supp. 3d 471, 484 (N.D.N.Y. 2019) (same).

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Nor does a complaint suffice if it tenders naked assertions devoid of further factual

enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555.  Although, "once a claim has been stated adequately, it may be supported by

showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a

plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.*

at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible,

the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.  But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second

alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8

marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior

era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions.").

    "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95

(citation omitted).  Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district

courts are directed to confine their consideration to "the complaint in its entirety, . . . documents

incorporated into the complaint by reference, and matters of which a court may take judicial

notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

Finally, fraud claims—including common law fraud claims—are subject to the heightened pleading standard set forth in Rule 9(b). *See Matana v. Merkin*, 957 F. Supp. 2d 473, 484 (S.D.N.Y. 2013) ("[A] claim for common law fraud under New York law must satisfy the requirements of the heightened pleading standard under Federal Rule of Civil Procedure 9(b)." (collecting cases)). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, courts "'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations,'" rather "'plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52, (2d Cir. 1995)). "An inference is 'strong' if it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Pilkington N. Am. Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 492 (S.D.N.Y. 2020) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015)).

B. Analysis

Defendant argues that (1) Plaintiff fails to state a plausible GBL claim because he has not plausibly pled that malic acid in the Product acts as a "flavor" or is "artificial," (*see* Def.'s Mem. 4–9); (2) Plaintiff has not plausibly alleged that the omission of an "artificially flavored" disclosure is likely to mislead consumers, (*see id.* at 9–13); (3) Plaintiff has failed to state a claim for breach of express warranty, because Plaintiff did not establish that the Product was likely to

deceive a reasonable consumer, and because Plaintiff failed to provide Defendant with pre-suit notice, (*see id.* at 13–14); and (4) Plaintiff has failed to plead fraud with particularity, as required under Rule 9(b), (*see id.* at 14–15).  The Court addresses each argument in turn, beginning with Defendant's argument as to Plaintiff's GBL claims.

### 1.  New York General Business Law § 349 and 350 Claims

"Section 349 [of the GBL] prohibits 'deceptive acts or practices in the conduct of any business, trade[,] or commerce,' whereas [§] 350 prohibits 'false advertising in the conduct of any business, trade[,] or commerce.'"  *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021) (alterations omitted) (quoting N.Y. Gen. Bus. L. §§ 349, 350).  "'The standard for recovery under . . . § 350, while specific to false advertising, is otherwise identical to [§] 349,' and therefore the Court will merge its analysis of the two claims." *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195, n.1 (N.Y. 2002)); *see also Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 802 (S.D.N.Y. 2021) (same); *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (noting that "courts have found that the scope of § 350 is as broad as that of § 349 . . . and that its essential elements are the same" (alteration in original) (citation omitted)).  To state a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Wynn*, 2021 WL 168541, at *2 (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)); *see also Cosgrove*, 520 F. Supp. 3d at 575 (adopting the same standard); *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (same).

a.  Consumer-Oriented Conduct & Injury

Defendant appears to concede—or at least, does not contest for purposes of its Motion—
that Defendant's conduct was consumer-orientated.  (*See generally* Def.'s Mem.)  "A defendant
engages in 'consumer-oriented' activity if [the company's] actions cause any 'consumer injury or
harm to the public interest.'"  *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002)
(quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  This
requirement is liberally construed, *id.*, and "may be satisfied by showing that the conduct at issue
'potentially affect[s] similarly situated consumers,'" *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54,
64 (2d Cir. 2010) (alteration in original) (quoting *Oswego Laborers' Local 214 Pension Fund v.
Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)).  Here, Plaintiff alleges that
Defendant "manufactures, labels, markets, and sells" the Product to consumers.  (*See* FAC ¶¶ 1.)
These allegations are sufficient to satisfy the first element of Plaintiff's GBL claim.  *See Karlin
v. IVF Am., Inc.*, 712 N.E.2d 662, 665 (N.Y. 1999) (observing that GBL §§ 349 and 350 "apply
to virtually all economic activity, and their application has been correspondingly broad"
(footnote omitted) (collecting cases)); *Sheth v. N.Y. Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (App.
Div. 2000) (noting that the "consumer-oriented" requirement may be satisfied "by a showing that
the practice has a broader impact on the consumer at large") (citation omitted).

Defendant also appears to concede or not contest for the purposes of its Motion that
Defendant has sufficiently alleged an injury.  (*See generally* Def.'s Mem.)  "An actual injury
claim under [§§] 349 and 350 typically requires a plaintiff to allege that, on account of a
materially misleading practice, she purchased a product and did not receive the full value of her
purchase."  *Duran*, 450 F. Supp. 3d at 350 (alterations omitted) (quoting *Daniel v. Mondelez
Int'l, Inc.*, 278 F. Supp. 3d 177, 195 (E.D.N.Y. 2018)).  "A plaintiff can show this injury by

alleging 'an overpayment, or a price premium, whereby a plaintiff pays more than she would have but for the deceptive practice.'" *Id.* (quoting *Izquierdo v. Mondelez Int'l Inc.*, No. 16-CV-4697, 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2017) (quotation marks omitted)). However, "[t]o allege injury under a price premium theory, a plaintiff must allege not only that [the] defendant[] charged a price premium, but also that there is a connection between the misrepresentation and any harm from, or failure of, the product." *Id.* (quotation marks and citation omitted); *see also Sabatano v. Iovate Health Scis. USA Inc.*, No. 19-CV-8924, 2020 WL 3415252, at *3 (S.D.N.Y. June 22, 2020) ("A plaintiff must also demonstrate reliance, which typically means he must point to a specific advertisement or public pronouncement upon which the consumer relied." (citation omitted)); *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 288 (E.D.N.Y. 2009) ("In order to make a claim under [GBL § 350], a plaintiff must plead reliance on a false advertisement at the time the product was purchased." (citing *Andrew Strishak & Assocs., P.C. v. Hewlett Packard Co.*, 752 N.Y.S.2d 400, 403 (App. Div. 2002))). Typically, a plaintiff makes this allegation by asserting that a particular product was marketed as having a special quality, that the marketing enabled the company to charge a premium for the product, and that the plaintiff paid this premium and later discovered that the product "did not, in fact, have the marketed quality." *Duran*, 450 F. Supp. 3d at 350 (collecting cases).

Here, Plaintiff alleges that he "purchased the Product because 'Natural Flavor With Other Natural Flavor' told him that only natural flavors were responsible for the mango and peach taste." (FAC ¶ 88.) Plaintiff also alleges that he "would not have bought the Product or would have paid less for it" had he "known the truth." (*Id.* ¶ 93.) At this early stage of the case, these allegations suffice to allege a price premium theory of injury. *See Fishon v. Peloton Interactive, Inc.*, No. 19-CV-11711, 2020 WL 6564755, at *10–11 (S.D.N.Y. Nov. 9, 2020) (allegations that

the plaintiffs "would not have purchased the [product], or would not have purchased it on the same terms, [had] they kn[o]w[n] the truth," were sufficient to survive dismissal, because "[n]o more is necessary at this stage"); *Duran*, 450 F. Supp. 3d at 351 (finding that the plaintiff adequately pled a price premium theory of injury where he alleged that he and other customers "paid full price for the [p]roduct but received something inferior to what [the defendant] had promised, and that, had [the plaintiff] known that the [p]roduct [was inferior], he would not have purchased the [p]roduct, or would have only paid significantly less for it" (citations omitted)); *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489, 2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016) (allegation that the plaintiff "would not have paid the premium price he paid" for the product had he "known the truth" was sufficient to state injury based on price premium theory (citation and quotation marks omitted)); *Singleton v. Fifth Generation, Inc.*, No. 15-CV-474, 2016 WL 406295, at *10 (N.D.N.Y. Jan. 12, 2016) (finding that the plaintiff stated a claim under § 349 where he alleged that, had he "known 'the truth,'" he "would not have bought the vodka, or would have paid less for it" (footnote and quotation marks omitted)).

### b.  Materially Misleading Conduct

Defendant instead largely focuses on the second element of Plaintiff's GBL claims, arguing that Plaintiff cannot state a cognizable claim for violations of GBL §§ 349 and 350 because no reasonable consumer would find Defendant's representations on the Product's label to be misleading.  (*See* Def.'s Mem. 4–13.)  Specifically, Defendant argues that Plaintiff has not plausibly alleged that malic acid acts like a flavor, nor has Plaintiff plausibly alleged that the malic acid used in the Product is artificial.  (*Id.* at 4–9.)

To survive a motion to dismiss, as noted, plaintiffs "must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers."  *Twohig*, 519 F.

Supp. 3d at 160 (quotation marks omitted) (quoting *Sarr v. BEF Foods, Inc.*, No. 18-CV-6409, 2020 WL 729883, at *3 (E.D.N.Y. Feb. 13, 2020)).  "Instead, plaintiffs must 'plausibly allege that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'"  *Id.* (quoting *Sarr*, 2020 WL 729883, at *3); *see also Weinstein v. eBay, Inc.*, 819 F. Supp. 2d 219, 228 (S.D.N.Y. 2001) (stating "the applicable legal standard is whether a reasonable consumer, not the least sophisticated consumer, would be misled by [a defendant's] actions").  "While it is possible for a court to decide this inquiry as a matter of law, this inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage."  *Duran*, 450 F. Supp. 3d at 346 (citation omitted) (collecting cases).  "Notably, whether an interpretation is unreasonable as a matter of law is generally reached at [the motion to dismiss] stage only where, for instance, a plaintiff's claims as to the impressions that a reasonable consumer might draw are 'patently implausible' or unrealistic."  *Eidelman v. Sun Prods. Corp.*, No. 16-CV-3914, 2017 WL 4277187, at *4 (S.D.N.Y. Sept. 25, 2017) (quoting *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826, 2015 WL 5579872, at *20 (E.D.N.Y. Sept. 22, 2015)); *see also In re Frito-Lay N. Am. Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *16 (E.D.N.Y. Aug. 29, 2013) (explaining that claims which "border on fantasy" require "dismissal as a matter of law").

Plaintiff primarily alleges that Defendant's representation that the Product contains "natural flavor with other natural flavor" is misleading because the Product in reality contains an artificial form of malic acid, namely DL-Malic Acid.  (*See* FAC ¶¶ 24–31.)  In addition, Plaintiff alleges that Defendant's representations are misleading because they violate federal and state regulations dictating the "source of a food or beverage's characterizing flavors."  (*See id.* ¶¶ 66–88.)  Defendant argues that Plaintiff cannot plausibly allege that malic acid acts as an "artificial

flavor" because Plaintiff cannot establish that the malic acid used in the Product is either

"artificial" or a "flavor." (Def.'s Mem. 4–9 (emphasis omitted).) For the reasons stated below,

the Court agrees that Plaintiff has failed to allege that a reasonable consumer would be misled by

the representations on the Product.

   Defendant cites several lines of cases, both inside and outside the Second Circuit, that

Defendant argues stand for the proposition that Plaintiff has no viable claim. (*See generally id*.)

Specifically, Defendant and Plaintiff argue extensively about whether Plaintiff can establish that

malic acid functions as a "flavor" inside of the Product. (*See* Def.'s Mem. 5–8; Pl.'s Mem. 3–5;

Def.'s Reply 2–5.) In doing so, Plaintiff cites to several out-of-circuit cases that have previously

held that held "whether malic acid functions as a flavor . . . in a particular food product is a

factual dispute inappropriate for resolution on a motion to dismiss." *Willard v. Tropicana Mfg.*

*Co., Inc.*, No. 20-CV-1501, 577 F. Supp. 3d 814, 827 (N.D. Ill. 2021); *see also Hayes v. Gen.*

*Mills, Inc.*, No. 19-CV-5626, 2021 WL 3207749, at *3–4 (N.D. Ill. July 29, 2021); *Noohi v.*

*Kraft Heinz Co.*, No. 19-CV-10658, 2020 WL 5554255, at *4 (C.D. Cal. July 20, 2020); *Sims v.*

*Campbell Soup Co.*, No. 18-CV-668, 2018 WL 7568640, at *5 (C.D. Cal. Sept. 24, 2018);

*Branca v. Bai Brands, LLC*, No. 18-CV-757, 2019 WL 1082562, at *8 (S.D. Cal. Mar. 7, 2019);

*but see Gouwens v. Target Corp.*, 2022 WL 18027524, at *3–5 (W.D. Ill. Dec. 30, 2022)

(dismissing a case for failing to "plausibly plead that a reasonable consumer could be misled"

based on the plaintiff's "fanciful and unreasonable interpretation of the [p]roduct's label"); *Akers*

*v. Costco Wholesale Corp.*, 21-CV-1098, 2022 WL 4585417, at *3–4 (S.D. Ill. Sept. 29, 2022)

(dismissing a case for failure to state a claim regarding flavored sparkling water allegedly

containing synthetic malic acid). Of course, this Court may consider cases in sister districts

around the country in deciding a motion to dismiss. However, these cases analyze inapplicable

consumer protection laws to the instant Action, namely Illinois and California consumer

protection laws.  Moreover, the Court does not need to decide the question as to whether malic

acid functions as a flavor in the Product, as there is a set of relevant cases cited throughout

district courts in the Second Circuit that are fatal to Plaintiff's allegations that malic acid is

"artificial."

For the past several years, Plaintiff's counsel has brought numerous cases in district

courts throughout the Second Circuit alleging that various products marketed as containing

"vanilla" are materially misleading because the products allegedly did not contain naturally

derived vanilla extract (collectively, "the Vanilla Cases").  *See, e.g., Wynn*, 2021 WL 168541 at

*1–2; *Barreto*, 518 F. Supp. 3d at 800–01; *Turnipseed v. Simply Orange Juice Co.*, No. 20-CV-

8677, 2022 WL 657413, at *1 (S.D.N.Y. Mar. 4, 2022); *Myers v. Wakefern Food Corp.*, No. 20-

CV-8470, 2022 WL 603000, at *1–2 (S.D.N.Y. Mar. 1, 2022); *Santiful v. Wegmans Food

Markets*, No. 20-CV-2933, 2022 WL 268955, at *1–2 (S.D.N.Y. Jan. 28, 2022); *Budhani v.

Monster Energy Co.*, 527 F. Supp. 3d 667, 672–75 (S.D.N.Y. 2021); *Twohig*, 519 F. Supp. 3d at

157–159; *Steele v. Wegmans Food Markets Inc.*, 472 F. Supp. 3d 47, 48–49 (S.D.N.Y. 2020);

*Pichardo v. Only What You Need, Inc.*, No. 20-CV-493, 2020 WL 6323775, at *1 (S.D.N.Y. Oct.

27, 2020); *Cosgrove v. Blue Diamond Growers*, No. 19-CV-8993, 2020 WL 7211218, at *1–2

(S.D.N.Y. Dec. 7, 2020); *Sharpe v. A&W Concentrate Co.*, 481 F. Supp. 3d 94, 96–98 (S.D.N.Y.

2020).  While Plaintiff argues that these "cases about the labeling of products as 'vanilla' [are]

inapposite[,]" (*see* Pl.'s Mem. 6–7), the Court disagrees.

The Vanilla Cases by and large stand for an analogous proposition that "the word vanilla,

by itself, indicates a flavor, and the labels in question made no representation as to any particular

ingredient(s) that were contained in the product or were the source of that flavor in the product."

*Budhani*, 527 F. Supp. 3d at 677 (quotation marks omitted).  In coming to this conclusion, these courts distinguished themselves from Second Circuit precedent that found that a reasonable consumer could be misled into believing that a particular ingredient (rather than specific flavors) exists inside of a product.  *See Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2d Cir. 2018) (finding that a cracker box labeled with "MADE WITH WHOLE GRAIN" and "WHOLE GRAIN" could mislead a consumer into believing that the grain product was "entirely or at least predominantly whole grain").  As such, the Vanilla Cases established a distinct line of cases within the district courts in the Second Circuit, distinguishing "flavors" from "ingredients" in food and beverage products.  Here, Plaintiff is clearly challenging the inclusion of various "flavors" in the Product, specifically whether the Product contains "natural flavorings" of mango and peach as advertised on the package.  (*See* FAC ¶ 1.)

As expected, each product within the Vanilla Cases spans the gamut of alleged representations to consumers.  *See, e.g.*, *Wynn*, 2021 WL 168541 at *1–2 (vanilla almond milk product that contains no "qualifying terms" such as "vanilla-flavored," "contains artificial flavors," or "with other flavors"); *Pichardo*, 2020 WL 6323775, at *1 (non-dairy vanilla protein beverage with a vanilla flower vignette and the words "Smooth Vanilla").  However, and as stated succinctly in *Turnipseed v. Simply Orange Juice Co.*, No. 20-CV-8677, 2022 WL 657413 (S.D.N.Y. Mar. 4, 2022), "[*n*]*umerous* other courts . . . have already dismissed [these] near-identical challenges" for the same reasons.  *Id*. at *3.  For example, in *Barreto v. Westbrae Natural, Inc.*, 518 F. Supp. 3d 795 (S.D.N.Y. 2021), the plaintiff sued a manufacturer over alleged representations on the label of a vanilla-flavored soymilk product.  *Id*. at 799–800.  The soy-milk container described the product as "Vanilla Soymilk" on the front label, and the ingredient list discloses that it contains "Natural Vanilla Flavor With Other Natural Flavors."  *Id*.

at 800. These disclosures, taken together, are effectively the same as the disclosure at issue in the instant Action. (*See* FAC ¶¶ 1, 24–25.)

Faced with this representation, the court in *Barreto* addressed whether the plaintiff's allegations that a reasonable consumer could be materially misled for two reasons. *See id.* 802–06. First, the court questioned the bare claim of a misrepresentation on the container, noting that "[i]n assessing the product's packaging as a whole, a reasonable consumer would conclude that the soymilk has a vanilla flavor and at least some of it is natural vanilla flavor. There is no claim anywhere on the packaging that natural vanilla is the predominant source of the vanilla flavor . . . ." *Id*. at 802–03. Here, the Product matches that in *Barreto*. As alleged by Plaintiff, for those consumers who "are increasingly concerned about the ingredients added to what they eat and drink," (*see* FAC ¶¶ 2–23), consumers will read the front of the Product stating that the Product contains "natural flavor and other natural flavor," (*see id*. ¶ 1). For those consumers interested in the ingredients, they will turn to the back side of the bottle that lists "less than 2% of natural flavor." (*Id*. ¶ 27.) The ingredient list (as well as the representation on the front of the bottle) does not state exactly what "natural flavors" are being used, though Plaintiff assumes it to be only mango and peach. While there is a representation by Defendant as to the proportion of these "natural flavors" in the Product, at no point does Defendant state that the Product is *only* filled with natural flavors. Instead, the only two representations that a reasonable consumer would see are two matching statements: that the Product contains "natural flavors." As such, it is hard for the Court to see how a reasonable consumer would be misled merely because there may also be non-natural flavors. *See, e.g.*, *Steele*, 472 F. Supp. 3d at 50 (finding that a representation that vanilla ice cream contains "natural vanilla flavor" does not mislead consumers where the ingredient list "mentions neither vanilla beans nor extracts" and does not show "the components,

amounts[,] or proportions of the Natural Flavor");  *Wynn*, 2021 WL 168541, at \*4 (finding that,

where a vanilla almondmilk "front label [made] no representations whatsoever about the source

of the vanilla flavor or the ingredients constituting it," the plaintiffs had failed to allege that a

reasonable consumer would be misled).

      Plaintiff appears to concede that there are likely *some* natural flavors within the product,

namely mango and peach.  (FAC ¶¶ 57–65.)  However, Plaintiff alleges that "the ingredient list

does not disclose that [] malic acid is an artificial flavoring ingredient which provides the

Product's mango and peach taste."  (*Id*. ¶ 29.)  Plaintiff makes this conclusory claim several

times throughout the complaint but provides only a single factual allegation to bolster his

argument: alleging that "[l]aboratory analysis concluded the Product contains artificial, DL-

Malic Acid instead of natural, L-Malic Acid."  (*Id*. ¶ 65; *see also id.* ¶ 64 ("Since there are

natural and artificial types of malic acid, laboratory analysis is required to identify which type

was used in the Product.").)  Again, the Vanilla Cases provide this Court with key guidance to

interpret Plaintiff's allegation.

      In *Barreto*, the plaintiff similarly cited "Gas-Chromatography-Mass Spectrometry

analysis ('GC-MS')" of four chemical compounds present in vanilla beans.  *Barreto*, 518 F.

Supp. 3d at 800–01.  Even with specific allegations in the complaint based on this analysis, the

court concluded that "the analysis . . . does not state or otherwise plausibly support the

conclusion that the added vanillin comes from artificial rather than natural sources" because the

lab testing did not "purport to identify the source of vanillin as natural or artificial."  *Id*. at 803.

Several other Vanilla Cases came to the same conclusion: "[a]bsent any factually substantiated

allegations that the [vanilla compounds] in [the defendant's] product are not derived from natural

sources," courts have found that the vanilla plaintiffs "have failed to allege the presence of

artificial flavors, and their claim that the ingredient list makes a materially misleading omission thus fails.  *Wynn*, 2021 WL 168541, at *6; *see also Santiful*, 2022 WL 268955, at *4 (noting that the "[m]ost devastating" challenge to the plaintiffs' claim was that "[the] flavors can be either artificial or natural depending on how they are derived[,]" and finding that the complaint lacked "factually substantiated allegations that [the] flavors [were] in fact not derived from natural sources").

Here, Plaintiff plainly offers conclusory allegations about the *possibility* that the Product contains artificial DL-Malic acid, without any additional factual support from product testing. Liberally construed, the Amended Complaint alleges that the Product contains DL-Malic acid rather than natural L-Malic acid.  (FAC ¶¶ 24–65.)  However, instead of including factual allegations to support his claim, Plaintiff repeatedly deems it so with conclusory statements that Defendant "includes DL-Malic [a]cid to help make the Product taste tart and fruity, like mango and peach taste naturally[,]" and that DL-Malic acid functions "to provide, enhance, simulate, and or/reinforce the sweet, fruity, and tart taste that consumers associate with mango and peach." (*Id*. ¶¶ 60–62.)  And in an effort to substantiate the claim, Plaintiff again asserts—without any support—that amorphous "laboratory analysis" concluded that the Product contained artificial malic acid instead of its natural form.  (*Id*. ¶¶ 64–65.)  Even taking the allegations as true—as this Court must in this context—the allegations in the Amended Complaint are a far cry from raising "any factually substantiated allegations" that the Product contains artificial malic acid, rather than natural malic acid.  *Wynn*, 2021 WL 168541, at *6; *see also Myers*, 2022 WL 603000, at *4 (noting that the plaintiff "fail[ed] to provide any details whatsoever about [what] this laboratory test entailed" such as "describ[ing] the testing methodology followed, the specific date, time, or place of the testing, who conducted the testing, the qualifications of the testers,

etc.").  As in the Vanilla Cases, the "the lack of sufficient allegations here that the purportedly artificial flavors are in fact artificial is fatal to Plaintiff['s] claim that the ingredient list has made a material omission." *Wynn*, 2021 WL 168541 at *6.  As such, Plaintiff's allegations that the Product contains artificial flavors are conclusory statements that the Court is not required to accept.  *See Iqbal*, 556 U.S. at 678; *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (stating that courts "need not accept conclusory allegations or legal conclusions couched as factual [] allegations" (citations and quotation marks omitted)).

Plaintiff appears to allege, in the alternative, that Defendant's labeling violates FDA's regulations governing how flavorings in food are labeled.  Specifically, Plaintiff alleges that federal and state regulations "prohibit false and deceptive identification of the source of a food or beverage's characterizing flavors[,]" and that the Product is false and misleading because it is "required to be accompanied by the word(s) 'artificial' or 'artificially flavored[.]'"  (FAC ¶¶ 66–71.)  Under 21 C.F.R. § 101.22, an artificial flavor is defined as "any substance, the function of which is to impart flavor, which is not derived from . . . natural sources." *Id*. at § 101.22(a)(1). However, it is well established in this Circuit that the Amended Complaint "could not allege a claim for private enforcement of FDA regulations." *Barreto*, 518 F. Supp. 3d at 805; *see also Pichardo*, 2020 WL 6323775, at *3 n.6 ("There is no private right of action for breaches of FDA provisions, and violations of federal standards do not automatically translate into an actionable claim under GBL §§ 349–50." (quotation marks and citation omitted)); *Steele*, 472 F. Supp. 3d at 49–50 (stating that "the extensive discussion and argument" between parties about FDA standards was "without consequence" as the plaintiffs did not have a private right of action to enforce alleged violations of the FDCA); *Sharpe*, 481 F. Supp. 3d at 105 n.8 (dismissing plaintiff's separate cause of action based on a violation of FDA regulations because "[t]here is no

private right of action to enforce FDA regulations").  Moreover, in opposing the instant Motion, Plaintiff misapplies Second Circuit precedent explaining the relationship between a GBL claim and violations of other statutes that do not provide a private right of action.  (*See* Pl.'s Mem. 7.) In the Second Circuit, "a GBL claim is viable where the plaintiff 'make[s] a free-standing claim of deceptiveness under GBL § 349 that happens to overlap with a possible claim' under another statute that is not independently actionable, but fails where the violation of the other statute by conduct that is not inherently deceptive is claimed to constitute a deceptive practice that serves as the basis for the GBL [§ 349] claim."  *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 127 (2d Cir. 2017) (quoting *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 200 (2d Cir. 2005)).  Here, Plaintiff cannot state a claim because, for reasons described above, "the conduct alleged to violate the FDA regulations is not so inherently deceptive as to be misleading to a reasonable consumer under GBL §§ 349–50."  *Barreto*, 518 F. Supp. 3d at 806 (collecting cases).

Accordingly, because the Court concludes that the Product's labeling would not mislead a reasonable consumer, Plaintiff's claims under the GBL are dismissed.

### 2.  Violation of Other State Consumer Fraud Acts

Plaintiff also states claims for violations of Oklahoma and Virginia consumer fraud acts. (*See* FAC ¶¶ 121, 134–38.)  Defendant argues that both Oklahoma and Virginia employ a "reasonable consumer" standard in their respective consumer fraud statutes in line with the NY GBL, and thus should be dismissed as well.  (Def.'s Mem. 10 n.5.)  In response, Plaintiff quibbles with Defendant's placement of the argument in a footnote, but otherwise does not appear to materially contest the point.  (*See* Pl.'s Mem. 8.)

Courts have previously surveyed consumer protection statutes from states across the country and have found that "the critical issue . . . is whether a reasonable consumer would be misled by [a] [d]efendant's statement." *Harris v. Mondelez Global LLC*, No. 19-CV-2249, 2020 WL 4336390, at *2 (E.D.N.Y. July 28, 2020); *see also In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910, 920 (N.D. Ill. 2017) (noting that, while states' consumer protection laws "differ in certain particulars, all share a common requirement: to state a claim, a plaintiff must allege conduct that plausibly could deceive a reasonable consumer" (collecting cases)); *Nathan v. Whirlpool Corp.*, 492 F. Supp. 3d 747, 760 (S.D. Ohio 2020) (citing *Parmesan Cheese*, 275 F. Supp. 3d at 920) (collecting cases).  This Court agrees: both Oklahoma and Virginia consumer protection laws also employ the "reasonable consumer" standard, which dooms Plaintiff's other state law claims for the reasons stated above.

To state a claim under the Oklahoma Consumer Protection Act ("OCPA"), Okla. Stat. tit. 15 § 751, *et seq.*, "a plaintiff must show (1) that the defendant engaged in an 'unlawful practice' as that term is defined in section 753 of the Act; (2) that the challenged practice occurred in the course of the defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury." *Dinwiddie v. Suzuki Motor of Am., Inc.*, 111 F. Supp. 3d 1202, 1215 (W.D. Okla. 2015) (citing *Patterson v. Beall*, 19 P.3d 839, 846 (Okla. 2000)) (quotation marks omitted).  Under Oklahoma law, "unlawful practices" are defined as, among other things "commit[ting] an unfair or deceptive trade practice."  Okla. Stat. Ann. tit. 15 § 753(20).  A deceptive trade practice is defined as "a misrepresentation, omission or other practice *that has deceived or could reasonably be expected to deceive* or mislead a person to the detriment of that person."  *Id*. at § 752(13) (emphasis added).

Similarly, the Virginia Consumer Protection Act ("VCPA") "prohibits a supplier from making misrepresentations about its goods or services in connection with a consumer transaction." *Snider v. Hostess Brands, LLC*, No. 20-CV-516, 2021 WL 311871, at *2 (W.D. Va. Jan. 15, 2021) (citing Va. Code § 59.1-200(A)(1)). "To state a claim under the VCPA, a plaintiff must allege facts sufficient to show (1) that a fraudulent act or practice, (2) was committed by a supplier, (3) in connection with a consumer transaction." *Maines v. Guillot*, No. 16-CV-9, 2016 WL 3556258, at *3 (W.D. Va. June 6, 2016) (citation and quotation marks omitted). "In misrepresentation cases like this one, the plaintiff must also allege sufficient facts to demonstrate both reliance and damages." *Snider*, 2021 WL 311871, at *2 (citing *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014)).

Here, Plaintiff provides no argument distinguishing his claims in Oklahoma and Virginia from New York. (*See generally* FAC; Pl.'s Mem.) And this Court finds no reason to do so as well. Accordingly, because the Court previously concluded that the Product's labeling would not mislead a reasonable consumer, Plaintiff's claims under the OCPA and the VCPA are also dismissed.

### 3. Breach of Express Warranty

"An express warranty is an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." *Barreto*, 518 F. Supp. 3d at 806 (quotation marks omitted). To adequately state a claim for breach of an express warranty under New York law, plaintiffs must plead "(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by this breach." *Wynn*, 2021 WL 168541, at *7 (quoting *Goldemberg v. Johnson & Johnson*

*Consumer Cos.*, *Inc.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014)).  In addition, New York law

requires that the buyer, "'within a reasonable time after he discovers or should have discovered

any breach[,] notify the seller of breach or be barred from any remedy.'"  *Tomasino v. Estee*

*Lauder Cos.*, 44 F. Supp. 3d 251, 260 (E.D.N.Y. 2014) (quoting N.Y. U.C.C. § 2-607(3)(a)).  To

satisfy this notice requirement, a plaintiff must "alert [the] defendant that the transaction was

troublesome," but need not "include a claim for damages or threat of future litigation."

*Grossman v. Simply Nourish Pet Food Co.*, 516 F. Supp. 3d 261, 282 (E.D.N.Y. Jan. 27, 2021)

(alterations, quotation marks, and citation omitted).  Although "[t]he sufficiency and timeliness

of the notice is generally a question for the jury," *Tomasino*, 44 F. Supp. 3d at 260 (citation

omitted), to adequately plead the pre-suit notice requirement, "plaintiff[s] must provide factual

allegations—such as the date and method plaintiff[s] sent a pre-suit notice—supporting the

contention that [they] notified [the] defendant of the alleged breach within a reasonable time,"

*Grossman*, 516 F. Supp. 3d at 283.

Plaintiff has failed to adequately allege that he provided Defendant with any manner of

*pre-suit* notice, only vaguely alleging that "Plaintiff provided or will provide notice to

[D]efendant, its agents, representatives, retailers, and their employees" and that "Defendant

received notice and should have been aware of these misrepresentations due to complaints by

third-parties, including regulators, competitors, and consumers, to its main offices, and by

consumers through online forums."  (FAC ¶¶ 148–50.)  These allegations are plainly insufficient

to plead pre-suit notice and avoid dismissal.  *See Colpitts v. Blue Diamond Growers*, 527

F. Supp. 3d 562, 590 (S.D.N.Y. 2021) (finding allegation that "[the] [d]efendant received notice

and should have been aware of these misrepresentations due to numerous complaints by

consumers to its main office over the past several years" to be "too conclusory

and . . . unsupported by any specific factual allegations" to satisfy the notice requirement for suit (quotation marks omitted)); *Grossman*, 516 F. Supp. 3d at 283 (finding that the plaintiff's allegation that "within a reasonable time after they knew or should have known of [the] [d]efendant's breach, [the] [p]laintiff, on behalf of herself and [c]lass [m]embers, placed [the] [d]efendants on notice of their breach, giving [the] [d]efendants an opportunity to cure their breach, which they refused to do" was "insufficient to plead pre-suit notice" (quotation marks omitted)); *Petrosino v. Stearn's Prods., Inc.*, No. 16-CV-7735, 2018 WL 1614349, at *2 (S.D.N.Y. Mar. 30, 2018) (explaining that "[p]roper factual allegations should, at least, include the date and method by which [the] [p]laintiff afforded [pre-suit] notice to [the] [d]efendant," and dismissing claim for breach of express warranty where "[the] [p]laintiffs failed to allege any facts supporting the allegation that she notified [the] [d]efendant of the alleged breach within a reasonable time after its discovery"); *Singleton*, 2016 WL 406295, at *12 (finding that the plaintiff's allegation that "[the] [d]efendant must have been aware of [the] [p]laintiff's false and misleading advertising claims due to similar suits pending against [the] [d]efendant" to be insufficient to plead pre-suit notice because "[the] [p]laintiff was required to inform [the] [d]efendant, within a reasonable time, of the alleged breach involving his own purchase").

Plaintiff's arguments that pre-suit notice is not required or, in the alternative, that Plaintiff's original Complaint constitutes notice are unavailing.  (*See* Pl.'s Mem. 9.)  While Plaintiff is correct that there is a "line of New York cases suggesting that the notice requirement does not apply to retail sales," *Neri v. R.J. Reynolds Tobacco Co.*, No. 98-CV-371, 2000 WL 33911224, at *19 (N.D.N.Y. Sept. 28, 2000) (citing *Fischer v. Mead Johnson Labs.*, 341 N.Y.S.3d 257, 259 (App. Div. 1973)), numerous courts in the Second Circuit have explained that "this exception appears to be exclusively applied where the party alleges physical, *in addition to*

economic, injury," *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 143–44 (E.D.N.Y. 2018) (collecting cases); *see also Colpitts*, 527 F. Supp. 3d at 589 (explaining that "[b]ecause [the] [p]laintiff only alleges economic injury in the form of a price premium paid for the [p]roduct, this exception—to the extent it exists at all—is inapplicable," and dismissing breach of express warranty claim for failure to allege pre-suit notice.  And, while Plaintiff is correct that there is limited authority for the proposition that a plaintiff's pleadings could constitute pre-suit notice under certain circumstances, (*see* Pl.'s Mem. 9), the Court is persuaded by Judge Failla's reasoning in *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226 (S.D.N.Y. 2020), in which she explained that the case from which this limited authority stems (and on which Plaintiff relies)—*Panda Capital Corp. v. Kopo Int'l, Inc.*, 662 N.Y.S.2d 584 (App. Div. 1997)—does not stand "for a broad rule that a filed complaint qualifies as sufficient and timely notice."  440 F. Supp. 3d at 244–45.

Accordingly, Plaintiff's claim for breach of express warranty is dismissed.

### 4.  Fraud Claim

"Under New York law, stating a claim for fraud requires alleging (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff."  *Wynn*, 2021 WL 168541, at *7 (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)).  And, as explained above, to adequately plead fraud, plaintiffs must also meet the particularity requirement in Federal Rule of Civil Procedure 9(b), which "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and

(4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015) (citation omitted). *See also supra* II.A.

Defendant argues that Plaintiff's fraud claim fails because Plaintiff has failed to plead both the knowledge and fraudulent intent (or "scienter") requirements in a non-conclusory manner. (*See* Def.'s Mem. 14–15.) This Court agrees. While Plaintiff is correct that a fraud claim can plead scienter "generally," courts have been clear that "the plaintiff must still allege facts that give rise to a *strong inference* of fraudulent intent." *Colpitts*, 527 F. Supp. 3d. at 585 (emphasis added) (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 472 (S.D.N.Y. 2020)). "A plaintiff may demonstrate this inference by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (citations and quotation marks omitted). Liberally construed, the sum total of Plaintiff's allegations as to scienter are that Defendant "sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits," (FAC ¶ 92), and that "Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations," (*id.* ¶ 158). However, it is well-settled that a company's general profit motive is insufficient to plead scienter. *See, e.g.*, *Duran*, 450 F. Supp. 3d at 354 ("[S]imply alleging a defendant's self-interested desire to increase sales does not give rise to an inference of fraudulent intent."). And courts frequently find that allegations such as "[a] defendant's fraudulent intent is evinced by its failure to accurately identify the [p]roduct on the front label, when it knew its statements to be not true nor accurate" to be "conclusory" and "fall short of the Rule 9(b) standard." *Colpitts*, 527 F. Supp. 3d at 585 (quotation marks omitted) (collecting cases).

Accordingly, Plaintiff's fraud claim is dismissed.

### III. Conclusion

For the foregoing reasons, Defendant's Motion is granted.  Plaintiff has requested that should the Court grant Defendant's motion, this Court grant Plaintiff leave to file a Second Amended Complaint.  (*See* Pl.'s Mem. 10.)  Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (quotation marks and citation omitted).  "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, Plaintiff has already amended his complaint once after being prompted by a pre-motion letter from Defendant stating all of the grounds on which it would move to dismiss.  (*See* Dkt. No. 9.)  "Generally, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend."  *Turnipseed*, 2022 WL 657413, at *8 (collecting cases); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.") (alteration, footnote, and quotation marks omitted).

Moreover, Plaintiff has failed to otherwise suggest that he is "in possession of facts that would cure the deficiencies that Defendants highlighted in the instant motion and that the Court

highlighted in this [O]pinion." *Turnipseed*, 2022 WL 657413, at *8 (collecting cases); *see also*

*TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given

leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies

in the complaint).

      As such, the Court dismisses Plaintiff's Amended Complaint with prejudice.  The Clerk

of the Court is directed to terminate the pending motion, (*see* Dkt. No. 21), enter judgment for

Defendant, and to close the case.

SO ORDERED.

Dated:    February 7, 2023
         White Plains, New York

                                         KENNETH M. KARAS
                                United States District Judge